**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOHN PARSONS | : | Civil Action No. |
| | : | |
| | : | |
| v. | : | Case 3:23-cv-00272-RNC |
| | : | |
| | : | |
| SIGNIFY NORTH AMERICA | : | |
| CORPORATION | : | April 26, 2024 |

**PLAINTIFF'S SECOND MEMORANDUM OF LAW IN**
**OPPOSITION TO MOTION TO DISMISS**

John Parsons, Plaintiff herein, opposes Defendant's motion to dismiss as follows:

**Overview**

This case arises out of the national security interest in providing the U.S. Military with secure communications by LiFi means amidst deceit as to Chinese access to the same technology.

Radio transmissions are easily intercepted, and can reveal the location of troops and planes. LiFi communications are secure against interception. When the prime federal contractor asked Signify if the LiFi communications systems had ever been in China, Signify lied and said no. Signify had previously worked with the large Chinese telecommunications company, Oppo, concerning the same technology. It also had a warehouse in China storing this equipment. The technology had been revealed to

Chinese interests. Honesty and candor were demanded in that moment to protect U.S. interests.

Plaintiff's boss, Hakan Yuce, recounted the lie to Signify's LiFi development team. Plaintiff expressed deep concern, shaking his head and stating 'that's not right.' Signify fired Plaintiff for promoting honesty in federal contracting.

Lying about Chinese connections to obtain a federal subcontract compromises national security. Signify's retaliatory termination of Plaintiff's job violated significant public policy interests.

**Standards**

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation and quotation marks omitted). In reviewing such a motion, the Court must accept as true all nonconclusory factual allegations in the complaint. *Conservation L. Found., Inc. v. Shell Oil Co.*, 628 F. Supp. 3d 416, 429–30 (D. Conn. 2022). All reasonable inferences must be drawn in the plaintiff's favor. *Mazzei v. The Money Store*, 62 F.4th 88, 92 (2nd Cir. 2023).

**History**

For decades, U.S. military ground forces, naval forces and combat aircraft communicated via radio waves. Technological developments have allowed hostile

forces to track the radio transmissions to their origin, and thereby revealing where the U.S. forces are located. Radio transmissions can place U.S. forces in danger. Complaint, ¶5.

Plaintiff worked for Defendant as senior management in its TruLiFi division, whose core product was Light Fidelity or LiFi. LiFi transmits and receives data securely using infrared light waves. Intelligent Waves, the prime contractor, markets this new technology to the U.S. military as follows:

> The Electromagnetic (EM) War is On: Radio Frequency (RF) Communications is No Longer Sufficient. FSO and LiFi significantly increase the warfighter's safety and capabilities and keep Commanders informed to accomplish the mission. Both FSO and LiFi are unsusceptible to data interception, jamming, and detection, while still providing superb data rate communications across the battlefield.

Complaint, ¶8.

Defendant promotes its new technology as follows:

> Signify . . . has entered into a strategic technology collaboration with Intelligent Waves, developer of the award-winning, cyber-defense solution, GRAYPATH. Together, Signify's game-changing LiFi solution, Trulifi, and the GRAYPATH software use invisible light waves to enable reliable, secure, two-way wireless data communication, providing defense personnel with mission-critical connectivity.

Complaint, ¶9.

To sell this technology to the U.S. Government, Defendant must be a subcontractor to a federal prime contractor, in this case, Intelligent Waves.  Intelligent Waves met with Signify's management team, including Plaintiff's direct boss Hakan

Yuce, and directly asked if this technology had ever been delivered to China. Yuce boldly said no, even though he knew of deliveries of the technology to China, including a delivery to, and collaboration with, the Chinese telecom giant Oppo regarding LiFi. Complaint, ¶13. National security and the safety of U.S. troops depend on secure communications and preventing these technologies from being shared with, and used by, China against the U.S. military.

To develop the next stage of its work plan, Signify gathered eight team members, including Yuce and Plaintiff, to a meeting in the Netherlands in November 2022. During the meeting, Yuce announced to the team that he had been asked by Intelligent Waves if the LiFi had ever been delivered to China and that he denied any such deliveries. Yuce's statement was accompanied by a smirk. Complaint, ¶14.

Plaintiff responded with concern about the lie: shaking his head and stating 'that's not right.' Complaint, ¶15. The meeting continued without further discussion about the lie. When there was a break, Plaintiff approached Yuce privately and said again that "that's not right." Again, the meeting continued without discussion of the lie. Complaint, ¶16.

Up to that point, Plaintiff was a valued member of the management team, receiving increasing responsibilities and favorable performance reviews. The purpose of the meeting was to plan the future, which included Plaintiff. No layoffs were scheduled for the forthcoming budget developed during the four-day meeting.

Obviously, no decision had been made to terminate Plaintiff's employment before the meeting.

Yuce's lie concerned a matter of national security. [1] It violated Defendant's own standards regarding honesty and accountability in business dealings. [2] Nevertheless, Plaintiff was summarily fired upon his return to the U.S. for opposing the lie, his only offense being the call to honesty.

**1.    The common law public policy termination claim exists because Plaintiff has no cause of action under the statutes.**

In *Sheets v. Teddy's Frosted Foods, Inc*., 179 Conn. 471, 427 A.2d 385, (1980), the Connecticut Supreme Court held that an at-will employee has a cause of action for wrongful discharge if his termination violated public policy: "[i]t would be difficult to maintain that the right to discharge an employee hired at will is so fundamentally different from other contract rights that its exercise is never subject to judicial scrutiny regardless of how outrageous, how violative of public policy, the employer's conduct may be." *Id* @ 476.  Over the years, the scope of the public policy has expanded to

---

[1] According to FBI Director Christopher Wray, "[t]he greatest long-term threat to our nation's information and intellectual property, and to our economic vitality, is the counterintelligence and economic espionage threat from China." Complaint, ¶10.

[2] "Daily pressures and our drive for business performance should never stop us from making the right decision or for holding each other accountable if somebody does not other behave with honesty or in line with our standards." Complaint, ¶23.

protect a worker who alleges that "his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy . . . " *Faulkner v. United Technologies Corp*., 240 Conn. 576, 580–81, 693 A.2d 293 (1997)(citations omitted).  The motion to dismiss must be denied if such public policies were violated by Defendant's abrupt termination of Plaintiff's employment for opposing the lie.

*Faulkner*, *supra*. is a particularly significant case because the discharged employee asserted violations of a federal statute, the Major Frauds Act, 18 U.S.C. §1031. The Supreme Court held that "the public policy limitation on the at-will employment doctrine can be predicated on the violation of public policy expressed in a federal statute." *Faulkner, supra* @ 585–86. *Faulkner* remains as good law, as Defendant's silence on the issue confirms.  Faulkner, as does Plaintiff, had no available statutory remedies. Plaintiff properly pleads that his termination violated federal public policy.

The motion to dismiss rocks back and forth as to whether Plaintiff has statutory remedies, repeatedly claiming that he has failed to allege facts to meet those prerequisites.  Signify acknowledges, as it must, that the public policy exception is available to employees who would be *"otherwise without remedy*." Brief @ 5. Nevertheless, it argues repeatedly that Plaintiff has statutory remedies which he clearly does not.

In Section 1(a) of its brief, Signify asserts that Plaintiff has a statutory remedy under the False Claims Act. ("The First Count . . . is precluded by statutory remedy"). This claim fails because the timing of events does not fit the statute.  Signify was in pre-contract negotiations with the prime contractor.  The False Claims Act applies only to post-contract honesty in applications for payment.[3] The statutory remedy simply does not apply to pre-contract falsehoods, even though Signify argues that the public policy claim "fails because the FCA already provides a statutory remedial scheme."  Brief @ 9.  Signify never states how Plaintiff has standing to invoke the statutory remedy. Silence exposes the flaw in its argument.

Signify's argument is contradictory.  On the one hand, it argues that "[t]here can be no FCA violation where there are no allegations that Signify submitted a claim for payment to the federal government . . ." Defendant's Brief @ 7.  It is undisputed there was no federal contract. On the other hand, Signify claims FCA remedies exist:  "the FCA already provides a statutorily remedial scheme." Brief @ p. 9. Both statements cannot be true. Signify argues that there is no FCA claim but the FCA remedies exist.

---

[3]  For example, the False Claims Act sanctions one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. §3729 (a)(1)(A). A crime is committed under Section G if one "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government." The FCA only addresses actions after a contract is executed.

**Opposition to Motion to Dismiss -  page 7 of 16**

What the False Claims Act does provide is a clear public policy against false or fraudulent statements in government contracting. Plaintiff was fired for promoting honesty in the negotiations to obtain a federal subcontract.

Similar liberties are taken with the policies underlying the Major Fraud Act. Brief §1(b)("The First Count fails to allege a violation of the public policy of the Major Fraud Act"). The Act creates criminal liability for persons who seek to obtain government benefits through fraud, to wit, "to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §1031(a).  Preliminary negotiations with a prime contractor, before any submission to a federal agency, does not fall into either category.  The Major Fraud Act does, however, articulate a public policy favoring honesty in soliciting federal contracts. By necessity, that policy prohibits lying to obtain a federal subcontract, particularly a highly sensitive military contract.

The Major Fraud Act does provide an employee with a retaliation claim, but only for assisting in an ongoing criminal prosecution.  18 U.S.C. §1031(h)(1 & 2).  Plaintiff did not allege an ongoing prosecution or his assistance in one.  Plaintiff cannot avail himself of the remedies for retaliation without a pending criminal investigation.

In a third attempt to invoke nonexistent statutory remedies, Signify argues that "Plaintiff's common law claim of wrongful discharge is precluded by unexhausted

**Opposition to Motion to Dismiss -  page 8 of 16**

administrative remedies" under the Contractor Whistleblower Protection Act, 10 U.S.C. §4701. Brief, p. 11. The Whistleblower Act prohibits retaliation by a federal subcontractor against an employee for disclosing to "a person or body" illegalities or other violations "related to a Department [of Defense] contract." Once again, no Department of Defense contract existed. Signify was not a federal subcontractor at the time of termination, so the Act does not apply. Plaintiff had no remedies, or even standing, to assert any claim under this Act. Nevertheless, the Whistleblower Act is another clear example of a public policy promoting truth and honesty in military contracting.

Plaintiff agrees with Defendant that a "common-law approach to a claim of wrongful discharge is barred as long as a remedy has been made available to address the particular public policy concerns." Brief @ p.12. But Signify never identifies how Plaintiff could avail itself of these administrative remedies under the facts alleged in the complaint. The False Claims Act, the Major Fraud Act and the Contractor Whistleblower Protection Act simply provide Plaintiff no statutory relief. That is precisely the statutory void *Sheets* sought to cure when a significant public policy is violated by job termination.

The Connecticut Supreme Court recognized in *Sheets* that "when there is a relevant state statute," the court "should not ignore the statement of public policy that it represents." *Sheets*, 179 Conn. at 480, 427 A.2d 385. Signify ignores the public policy

framework derived from these statutes. Being dishonest about its relations with China in an effort to secure a subcontract violates the strong public policy favoring honesty in military contracting. Signify breached those public policies by lying about its involvement with the Chinese in LiFi communications. Protecting our military technology from Chinese infiltration is a vital public interest. [4]  Signify owed a duty to Intelligent Waves and the U.S. military to admit that the Chinese saw the technology first.  Plaintiff alleges a clear public policy that Signify cannot lie to obtain a federal subcontract, a policy meeting the *Sheets* and *Faulkner* standards. The anti-fraud public policy can only be vindicated by denying the motion to dismiss.

Signify pays lip service to those cases where "the employee was otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." Brief @ 5 & 9; *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn.App. 643 (1985) citing *Wehr v. Burroughs Corporation*, 438 F.Supp. 1052, 1054 (E.D.Pa. 1977). Signify's inability to demonstrate that statutory remedies exist is fatal to the motion to dismiss.

---

[4]  Complaint, ¶10:  According to FBI Director Christopher Wray, "[t]he greatest long-term threat to our nation's information and intellectual property, and to our economic vitality, is the counterintelligence and economic espionage threat from China."

**2.    The covenant of good faith and fair dealing applies where there is no statutory remedy for the employee who opposed fraudulent conduct.**

Defendant seeks to dismiss Plaintiff's claim for violation of the covenant of good faith and fair dealing by arguing that the covenant does not change at-will employment, while conceding that the covenant exists for "some important violation of public policy." Brief, p. 13.  Signify ignores the penumbra of contract honesty statutes, which evidence an important public policy.

The covenant of good faith and fair dealing was recognized in the employment context in *Magnan v. Anaconda Industries, Inc*., 193 Conn. 558,479 A.2d 78 (1984). Plaintiff sued his employer because he was terminated for his refusal to sign an untrue statement. While the court was careful to state that the covenant did not replace at-will employment with a just cause standard, the court saw "no reason to exempt employment contracts from the implication of a covenant of good faith and fair dealing" where "the cause for dismissal is derived from some important violation of public policy." *Id* @ 568-569.

Defendant cites *Mumma v. Pathway Vet Alliance, LLC,* -648 F. Supp. 3d 373, 396–97 (D. Conn. 2023) for support that at-will employment survives.  Of course it does.  But the case relies upon accepted precedent which says much more.  Outlining the standards for the good faith covenant, the Court wrote:

> "to be sure, "[a]n exception to that rule exists when the termination of an at-will employee violates some important public policy." *Scaife*, 493 F. Supp. 3d at 15

(citing *McKinstry v. Sheriden Woods Health Care Ctr., Inc.,* 994 F. Supp. 2d 259, 267 (D. Conn. 2014)). "But the exception is narrow and does not apply if an adequate statutory remedy exists by which the public policy violation can be enforced." Id. (citing Burnham v. Karl and Gelb, P.C., 252 Conn. 153, 158, 745 A.2d 178 (2000)). In Burnham, the Connecticut Supreme Court observed that "[a] finding that certain conduct contravenes public policy is not enough by itself to warrant the creation of a contract remedy for wrongful dismissal by an employer." 252 Conn. at 159, 745 A.2d 178 (quoting Atkins v. Bridgeport Hydraulic Co., 5 Conn. App. 643, 648, 501 A.2d 1223 (1985)). Courts have allowed such a remedy only when *397 "the employee was otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." Id. at 159-60, 745 A.2d 178 (quoting Atkins, 5 Conn. App. at 648, 501 A.2d 1223) (emphasis in original). Because the plaintiff in Burnham had a statutory remedy available to her under Conn. Gen. Stat. § 31-51m, the Supreme Court affirmed the dismissal of her common-law claim. Id. at 161-62, 745 A.2d 178.

*Mumma v. Pathway Vet All., LLC*, 648 F. Supp. 3d 373, 396–97 (D. Conn. 2023).

The critical distinction from the *Mumma* case is that the employee asserted a claim under Conn. Gen. Stat. Ann. §31-51q (First Amendment protections in private work settings). Because Plaintiff had an adequate statutory remedy under §31-51q, the remedy pre-empted the application of the good faith covenant. "Dismissing her implied covenant claim will not leave her without a remedy." *Id.* Once again, Signifies failure to elucidate an available statutory remedy is fatal to its motion to dismiss.

Signify also attempts to whitewash the doctrine of good faith and fair dealing entirely. Signify wrongly asserts that "it is well-settled that the implied covenant of good faith and fair dealing does not apply to at-will employment." Brief, p. 12. To the contrary, *Magnan v. Anaconda Indus., Inc*., 193 Conn. 558, 572, 479 A.2d 781, 789 (1984) recognized that the covenant does apply to at-will employment to vindicate

important public policy. "In the absence of a public policy violation, there is no breach of the implied covenant of good faith and fair dealing." *Doherty v. Sullivan*, 29 Conn. App. 736, 743, 618 A.2d 56, 60 (1992). This case involves a public policy violation and therefore the covenant applies.

**Emotional Distress - Intentional & Negligent**

The third count alleges intentional infliction of emotional distress. The fourth count alleges negligent infliction of emotional distress. We need to consider the factual context for these claims.

At the meetings in the Netherlands, the 8-member management team reviewed future business plans for the budget and resources required to deliver the LiFi technology to Intelligent Waves.  Complaint ¶18.  The plans did not include any layoffs. To the contrary, the plan identified under-staffing for the projected plan. Yuce accepted the plans. *Id.*

With a smirk, Yuce told the team that he lied to Intelligent Waves about past LiFi dealings in China. Plaintiff raised a red flag, suggesting that 'that's not right.'

Plaintiff was a key member of the team.  He had positive reviews and received promotions and salary raises. The budget Yuce approved included Plaintiff's salary and benefits for the coming year. There was no sign of impending termination.

Yuce had a problem when Plaintiff questioned his dishonesty about the Chinese connections.  Even though the other team members said nothing, Yuce needed to send

a message to them not to question his loathsome tactics.  Honesty and full disclosure were firing offenses.

The elements of intentional infliction of distress are pled:

(1) that Defendant intended to inflict emotional distress or that it knew or should have known that emotional distress was the likely result from such conduct;

(2) that the conduct was extreme and outrageous;

(3) that the defendant's conduct was the cause of the plaintiff's distress; and

(4) that the emotional distress sustained by the plaintiff was severe."

*Hall v. Bergman*, 296 Conn. 169, 183, 994 A.2d 666, 675 (2010).

To be fired for encouraging honesty and the disclosure of information relevant to military operational security is an offensive act. It was extreme, there being no prior cause for termination. The termination caused the premature ending of Plaintiff's productive career, resulting in severe distress.  Complaint, ¶54.

The same cause for concern and devastation underlie the claim of negligent infliction of distress.  Plaintiff pled the elements of the claim:

(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress;

(2) the plaintiff's distress was foreseeable;

(3) the emotional distress was severe enough that it might result in illness or bodily harm; and

(4) the defendant's conduct was the cause of the plaintiff's distress.

*Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003).

The ruination of a man's career for seeking to be truthful and honest in military contracting created an unreasonable risk of harm to Plaintiff. The distress was clearly forseeable.  The severity of emotional distress is a matter of fact to be determined at trial.  There is no question that Signify was the cause of the distress, presumably to keep its dirty secret hidden.

**Conclusion**

The motion to dismiss presents a Catch-22 scenario.  On the one hand, Signify claims that statutory remedies exist for Plaintiff, which would defeat the public policy claims.   On the other hand, Signify claims that the remedial statutes do not apply. It never articulates how Plaintiff would be eligible for statutory relief, because it cannot

One either has available statutory remedies or one does not.  If statutory remedies are not available, the public policy exception under *Sheets* cures that void where fraudulent wrongdoing has occurred.  National security, undergirded with honesty in federal contracting, is a paramount public policy interest.

**JOHN PARSONS,**
**Plaintiff**

By:  _____S/_____
Charles D. Houlihan, Jr.
No. Ct 11416
Post Office Box 582
Simsbury, CT 06070

Telephone:   (860) 658-9668
E-Mail:    charles@houlihan.law
Telecopier:   (860) 658-1339

**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been mailed electronically to the following counsel of record:

John G. Stretton
Andres Jimenez-Franck
Ogletree Deakins Nash, Smoak &
Stewart P.C.
281 Tresser Boulevard, Suite 602
Stamford, CT 06901
Phone: 203-969-3102
Fax:203-969-3150
john.stretton@ogletree.com
andres.jimenez-franck@ogletree.com

on April 26, 2024.

_____s/_____
Charles D. Houlihan, Jr.